1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9             FOR THE EASTERN DISTRICT OF CALIFORNIA

10   JAMES RANDOLPH KERNS,

11              Petitioner,              No. CIV S-05-0746 GEB KJM P

12        vs.

13   DERRAL ADAMS, Warden,[1]

14              Respondent.              FINDINGS AND RECOMMENDATIONS

15   _____/

16              Petitioner is a state prison inmate proceeding pro se with a petition for a writ of

17   habeas corpus under 28 U.S.C. § 2254.  Respondent argues that the petition is untimely and also

18   has no merit.

19   I. Timeliness of the Instant Petition

20        A.  Procedural Background

21              Petitioner was charged with the murder of Mwasi Amar Dennis and the

22   intentional discharge of a firearm causing great bodily injury.  The charging document also

23   alleged that petitioner had suffered a prior serious felony conviction.  CT 6-8.  Petitioner was

24   found guilty of the murder and the firearm enhancement and the prior conviction allegation were

25   _____

26        [1]  The court substitutes petitioner's current custodian.  Fed. R. Civ. P. 25 (d).

1  found to be true.  CT 5, 205-207, 241.  He was sentenced to state prison for a total term of

2  seventy-five-years-to-life.  CT 241.  He filed a notice of appeal on September 28, 1999.  CT 244-

3  245.

4          On August 4, 2000, appellate counsel filed an opening brief in the Court of

5  Appeal.  Lodged Doc. (Lodg. Doc.) 5.[2]

6          On December 5, 2000, while the appeal was pending, petitioner filed a petition for

7  a writ of habeas corpus in the superior court, alleging that counsel was ineffective for two

8  reasons:  he failed to call Barbara Dixon and Denise Cooper as alibi witnesses and to present a

9  receipt and video surveillance supporting the alibi; he failed to object to jury misconduct after

10 Denise Cooper reported seeing the jurors, the witnesses and the victim's family together during

11 breaks, and after the jury heard the victim's mother accuse petitioner and his family of the

12 murder.  He also alleged that appellate counsel was ineffective in failing to argue the evidence

13 was insufficient, the conviction was based on false testimony, and trial counsel failed to call

14 witnesses.  In ground three, petitioner claimed that testimony by Jonathan Bush and Mrs. Era

15 Marshall was false and tainted.  In ground four, he claimed insufficiency of the evidence.  Lodg.

16 Doc. 11.  The superior court denied the writ on December 11, 2000.  Id.

17         Petitioner filed a second collateral attack with the superior court on January 17,

18 2002, again while the direct appeal was still pending.  Lodg. Doc. 12.  He alleged that trial

19 counsel refused to turn over the case file at the conclusion of the trial proceedings.  The superior

20 court denied this petition on February 6, 2002.  Id.

21         The Court of Appeal affirmed petitioner's conviction on August 13, 2002.  Lodg.

22 Doc. 9.  Petitioner pursued his direct appeal to the California Supreme Court, which denied his

23 petition for review on November 13, 2002.  Lodg. Doc. 10.

24 /////

25

26      [2]  The court is using the numbers assigned to the documents by respondent's Notice of
Lodging, filed August 19, 2005 (docket no. 11).

1          Petitioner filed a third habeas petition in the superior court on December 1, 2003,

2    raising five grounds.  Lodg. Doc. 13.  First, he alleged trial counsel was ineffective for failing to

3    call defense witnesses who had been subpoenaed, failing to investigate and present exculpatory

4    defense witness, failing to present exculpatory evidence, failing to investigate and present

5    evidence on third party culpability and failing to investigate jury misconduct and to object that

6    the verdict was based on this misconduct.  Second, he claimed that his conviction was based on

7    the false and perjured testimony of two witnesses, Jonathan Bush and Mrs. Marshall.  Third, he

8    argued that the evidence was insufficient because it was based on Bush's and Marshall's

9    testimony.  Fourth, the jury heard the victim's mother accusing petitioner and his girlfriend,

10   Denise Cooper, of killing the victim.  Fifth, he urged that his conviction was invalid because the

11   trial court made several errors, which implicated petitioner's right to confront witnesses:  the

12   judge allowed a witness to respond yes or no, which prevented a thorough examination, in

13   violation of his right to confront adverse witnesses, and he allowed a prior witness to be the

14   interpreter for another witness.  Lodg. Doc. 13.  The Superior Court denied this petition on

15   December 22, 2003.  Id.

16         Petitioner filed the same petition with the Court of Appeal on February 3, 2004;

17   the Court of Appeal denied the petition on February 11, 2004.  Lodg. Docs. 14 & 15.

18         Finally, petitioner filed the same petition in the California Supreme Court on

19   February 23, 2004; the court denied it on December 22, 2004.  Lodg. Docs. 16 & 17.

20         The instant petition was filed on April 18, 2005.

21         B.  The Statute of Limitations

22         One of the changes the Antiterrorism and Effective Death Penalty Act (AEDPA)

23   made to the habeas statutes was to add a statute of limitations for filing a habeas petition:

24              (d)(1) A 1-year period of limitation shall apply to an application for
               a writ of habeas corpus by a person in custody pursuant to the
25              judgment of a State court. The limitation period shall run from the
               latest of–

26

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post- conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244.

A conviction is final for purposes of the AEDPA statute of limitations at the expiration of the ninety day period for seeking certiorari. Bowen v. Roe, 188 F.3d 1157, 1159 (9th Cir. 1999). In this case, that ninety day period ended on February 12, 2003 and the AEDPA year began to run on February 13, 2003, to expire on February 14, 2004, absent any tolling. Fed. R. Civ. P. 6(a) (excluding the day from which the period begins to run from the calculation of the time).

The statute of limitations is tolled during the pendency of any "properly filed" state collateral attack on the judgment. Nino v. Galaza, 183 F.3d 1003, 1006-07 (9th Cir. 1999). However, a state petition filed after the limitations period has run will neither revive nor toll the statute of limitations. Jimenez v. Rice, 276 F.3d 478, 481 (9th Cir. 2001).

In Carey v. Saffold, 536 U.S. 214, 218-21 (2002), the Supreme Court held that the AEDPA statute of limitations is tolled not only between the actual filing and decision on a writ, but also during those periods between filings as a petitioner works his or her way "up the

1   ladder" through higher courts to complete "one full round" of state court review of claims. Id. at

2   217, 219-20.  However, in Evans v. Chavis, 546 U.S. 189, (2006), the Supreme Court directed

3   the federal courts to determine whether a "gap" petition was delayed unreasonably, even when a

4   state court did not deny the petition as untimely.  The court suggested that a gap longer than the

5   thirty to sixty days permitted in states with written rules for filing might be reasonable, while six

6   months would not be.  Id. at 201.

7          In this case, there were no significant gaps between the third Superior Court

8   petition, filed on December 1, 2003, and the subsequent petitions in the Court of Appeal and the

9   Supreme Court.  Accordingly, petitioner is entitled to statutory tolling from December 1, 2003

10  until December 22, 2004, a period of 388 days.  This would extend the statute of limitations to

11  March 8, 2005; the instant petition, filed April 18, 2005, would be untimely.

12         However, in Houston v. Lack, 487 U.S. 266, 276 (1988), the Supreme Court held

13  that a document is filed when it is given to prison authorities for mailing, a doctrine that has been

14  dubbed the prison mailbox rule.  See also Patterson v. Stewart, 251 F.3d 1243, 1245 n.2 (9th Cir.

15  2001).  In this case, the certificate of service for the superior court petition filed on December 1,

16  2003, is dated October 16, 2003, which means that the filing date for the round of state habeas

17  petitions is deemed to be that date.  Using October 16 as the starting day, petitioner is entitled to

18  435 days of statutory tolling, which extends the statute of limitations to April 23, 2005.  The

19  instant petition is timely.

20  II.  Facts

21         In 1997 petitioner and Mwasi Dennis were next door neighbors.  RT 22-23, 34.

22  Dennis kept snakes and on occasion, the snakes would come into petitioner's yard.  RT 23, 34.

23   In April, petitioner found one of the snakes in the front yard and threw it on the grass pile.  RT

24  35-36.  Dennis confronted petitioner about this snake, accusing petitioner of killing it.  RT 24,

25  36.  The argument escalated into a physical fight, with the two wrestling and exchanging blows.

26  RT 25, 37.  Although petitioner's girlfriend, Denise Cooper, was able to break up the fight,

1   Dennis retrieved a stick from his back yard, came up behind petitioner and hit him in the head.

2   RT 26, 38-40.  Petitioner declined to press charges.  RT 82.

3          Dennis moved out of that house about six weeks later and was in jail for a period

4   of time.  RT 27, 43.  Petitioner and Cooper also moved away from that neighborhood to the

5   Sunnyslope Apartments.  RT 43.[3]  Jonathan Bush, who knew petitioner as B or Boogie, met

6   petitioner and Don Carter, whom he knew as Brukindo, while hanging around the Sunnyslope

7   Apartments.  RT 165, 166, 167.  Bush was known as Evil or E or Little E.  RT 200, 209.

8          In October 1998, Dennis and his cousin, Dion Adams, saw petitioner working on

9   a car at an apartment complex around the block from Dennis's mother's house.  RT 66.

10  Petitioner held his hand up like a gun and popped it at Dennis.  RT 67.

11         On October 29, 1998, Dennis was visiting his girlfriend.  RT 89.  He borrowed

12  her car and left her house between 11:30 a.m. and 12:00 noon, saying he was going to the store.

13  RT 90.  According to Bush, he, Carter and petitioner were sitting by the basketball courts around

14  11:30 a.m. when Dennis (whom Bush knew as "Black") drove up in a white Escort and asked

15  about buying marijuana.  Dennis had a beer in his hand.  RT 213-215.  Petitioner, or perhaps

16  Carter, said some was available on 68th Avenue.  RT 169, 221.  Carter or petitioner mentioned a

17  brother or a relative with marijuana on 68th.  RT 231.  Dennis showed Bush and Carter the

18  money he had for drugs.  RT 216.

19         Dennis said he did not want petitioner in the car with him because he had been in

20  a fight with petitioner.  RT 170.[4]  Dennis told those assembled that he had used a stick on

21  petitioner during this fight.  RT 181, 219.  Petitioner said, "It's cool.  I'm not tripping."  RT 171-

22  172. Petitioner went to his apartment, saying he was going to grab a sweater.  RT 172, 205.

23

24         [3] When he spoke to detectives, however, petitioner claimed to be homeless.  RT 280.

25         [4] According to Bush, Dennis claimed to have caused a scar under petitioner's lip.  RT
    170-171, 220.  Given the opportunity to look at petitioner, Bush acknowledged there was no scar.
26  RT 171.  Nevertheless, Bush was clear that petitioner was with them on October 29.  RT 171.

1    When he returned to the car, petitioner was wearing a black hooded sweat shirt, a black beanie,

2    black jeans and cloth gloves.  RT 173, 175.

3           Petitioner and Carter got in the back seat and Bush got in the front seat.  RT 177.

4    Bush was wearing a Pendleton shirt and a FILA beanie; Carter was also wearing a black sweater.

5    RT 178-179.  Petitioner gave directions to Dennis, who said something like "the last time I seen

6    you, we was going to it."  Petitioner replied, "It's cool."  RT 180.  However, as they turned onto

7    68th behind a truck, petitioner said, "It's not never cool," and Bush heard a gunshot.  RT 181.

8           At first, Bush thought there had been a drive-by shooting; a white car had driven

9    past, playing loud music.  RT 183, 225.  However, as the car rolled to a stop, petitioner began

10    kicking the seat, trying to get out of the car.  Bush got out and went to help Dennis out, but then

11    realized he had been shot.  Carter was crying.  RT 184.  They helped petitioner out of the car and

12    then Bush saw the gun, a .380.  Petitioner said, "that's what that fool gets."  RT 187.

13           Carter and Bush started running.  Petitioner started to run as well, then stopped

14    and appeared to talk to someone, but then ran behind Carter and Bush.  RT 185.  Bush saw a

15    woman he knew and hoped to get a ride, but Carter and petitioner were behind him.  RT 227,

16    228.  When they got to where the street began to curve, they ran through a yard.  Carter was

17    crying, so Bush kept urging him to run.  RT 186.

18           When they reached the canal, petitioner said, "take that shit off," so Bush stripped

19    off his Pendleton and beanie, Carter removed his sweater, and petitioner took off his sweater and

20    shirt.  RT 186, 188; see also RT 124-125, 136 (officers found two beanies and a black hooded

21    sweatshirt in the canal area behind Della Circle and a Pendleton shirt on Loucreta, the street

22    north of Della); RT 102, 104, 107, 108 (resident retrieved some gloves from her green waste

23    container after seeing three men run through her back yard).  Petitioner said, "you all better not

24    open your mouth."  RT 191, 285-286; CT 98.  He also said he would concoct an alibi, that he

25    was with his girl the entire time.  RT 198.

26    /////

1    Carter and Bush lost sight of petitioner for awhile and then saw him again by

2  Kennedy Elementary School.  RT 194.  Bush and Carter got a ride from Robert Enriquez, whom

3  Bush knew as "Big Cheese."  RT 195-196.  According to Bush, Carter had a radio or tape

4  recorder with him.  RT 196, 224.

5    Between 11:45 a.m. and 12:45 p.m. on October 29, Robert Enriquez, who was

6  married to one of petitioner's cousins, was driving toward the Sunnyslope Apartments when two

7  men flagged him down.  RT 141.  Enriquez recognized one of the men, an African-American, as

8  "Evil," whom he had seen around the apartment complex; he did not know the other man.

9  RT 142.[5]  Evil and his companion were sweaty and had been walking fast.  RT 143.  The other

10  man was wearing a black hooded sweatshirt and was holding something that looked like a gun

11  box.  RT 143-145.

12    On October 29, 1998, Exell Marshall was pulling into his driveway on Della

13  Circle when he heard shooting.  RT 151.  He and his wife Era got out of their car and onto the

14  ground.  RT 152.  After the shooting, two African American men ran down Della Circle.

15  RT 154.  Another, lighter skinned man, moved in a different direction initially, but then joined

16  his companions.  RT 155-156.  This man raised his shirt and put a small black object in back of

17  his waistband.  RT 156, 368.  The person who tucked something in his waistband was not the

18  person who was wearing a plaid shirt; the man in the plaid shirt may have had gloves on.  RT

19  160, 162, 164.[6]

20  /////

21

22    [5] Enriquez knew petitioner as "Boogie."  RT 140.

23    [6] Exell Marshall told defense investigator Wayne Tellis he was helping his wife Era out
24  of the car when they heard the shot on October 29.  RT 481.  He said one of the two young black
    males walking down Della was the person who put the gun in his waistband.  RT 482.  He
25  described a third person as white or light skinned.  RT 483.  He also said the man in the plaid
    shirt was wearing gloves.  RT 484.  Marshall also told Deputy Rolinzo Flowers that he was
26  getting out his car when he heard the gunshot.  RT 523.  He said a white man ran west on 68th;
    the two black men ran north on Della Circle.  RT 524.

1     Era Marshall testified she was outside her house on Della Circle.  RT 320.[7]  From

2 her vantage point about seven feet from the car, she saw petitioner, who was sitting in the back

3 seat of the white car, shoot Dennis.  RT 326, 329, 340.  After the shooting, petitioner got out of

4 the car first.  RT 320, 345.

5     Mrs. Marshall said that two of the people who got out of the car came down Della

6 Circle, while petitioner ran down 68th Street.  RT 321, 322.  She saw petitioner put a gun in the

7 back waistband of his pants; she did not see Bush with a gun.  RT 322, 345.[8]  Petitioner stopped

8 and ran toward Loucreta.  RT 324.

9     Mrs. Marshall tried to tell police she had seen the shooting, but they did not listen

10 to her.  RT 349-350.  Officer Martinez confirmed that he did not ask Mrs. Marshall whether she

11 saw a gun or saw someone tucking a gun into his waistband.  RT 473.  She did indicate she saw a

12 white or Hispanic person go towards Florinda; she touched the officer's hand, which led him to

13 think she meant a white or Hispanic. She also said the two other, darker people had run in the

14 same direction.  RT 474.  When she came to court the day before she testified, she indicated to

15 her husband that petitioner was "the guy."  RT 364.

16     Maria Medellin lived on Della Circle, close to 68th; around noon on October 29,

17 she heard a loud gunshot.  RT 113.  She saw three young men running away; one was wearing a

18 black beanie and a Pendleton shirt.  One of the men was black, the others were lighter-skinned

19 and could have been black or Hispanic.  RT 114-115.  One of the men said, "Why did you shoot

20 him?"  RT 117.

21     Justin Perez provided a different description of the shooting.  Perez was visiting a

22 friend on Loucreta and 68th and standing by the garage when he saw a white car go by fast and

23

24     [7]  Mrs. Marshall is not able to speak clearly, but testified with the court's approval by
25 virtue of nods, hand signals, expressions interpreted by her husband and occasionally by writing
out answers to questions.  See, e.g., RT 309-331; see also pages 30-32 below.

26     [8]  Mr. Marshall was shown a picture of Bush, which allowed her to identify him.

1   then crash into a truck.  RT 424.  A person in the backseat was crouched down low.  RT 440.

2   Perez went to help the driver, but realized he had been shot.  RT 449.  Two people ran toward

3   Della; another walked down 68th.  RT 427-428.  This man had a gash in his eyebrow.  RT 445.

4   Perez knows petitioner; he did not see petitioner around the white car.  RT 429.

5           Around noon, Officer Steven Bicks received a call about a possible shooting at

6   68th Avenue and Della Circle.  RT 92.  He arrived at the scene at 12:04 p.m. and found Dennis in

7   the front seat of a white car, which had hit a truck.  Dennis had suffered a fatal wound and was

8   still gurgling.  RT 92-94.  Someone gave Bicks a black jacket with a pager that had been found in

9   a nearby yard.  RT 99.[9]

10          While Detective Elaine Stevenson was at the crime scene, Don Carter Jr. and his

11  father approached her.  Carter said he was afraid to give a statement because he thought that

12  petitioner[10] would find "E" so he could learn where Carter lived.  RT 281, 285.  He said that

13  when they were running, petitioner was concerned that Carter would snitch, but Bush assured

14  petitioner that he had nothing to worry about.  RT 286.  Carter said he was going to move to

15  Arizona.  RT 286.  Later, the district attorney's investigator could not find Carter to serve a

16  subpoena on him.  RT 293-295.

17          Denise Cooper, petitioner's girlfriend, presented a different account of the events

18  of October 29, 1998.  Cooper was off work that day.  RT 45.  Petitioner left the apartment around

19  eleven to pick up their daughter Brianna from school, as was his habit.  RT 45, 46.  About an

20  hour after petitioner and Brianna returned home, the three of them went shopping, using

21  petitioner's Cutlass.  RT 48.  Between the time petitioner arrived home and the time the three left

22  to go shopping, petitioner did not leave the apartment.  Id.

23  ────────────────

24      [9]  This was not tied to the murder, at least during the trial.  The failure to investigate this
    incident is part of petitioner's claim of ineffective assistance of trial counsel.

25      [10]  The court had ruled that Carter's statement should be edited so that petitioner was not
    explicitly mentioned; as presented to the jury, Carter told Stevenson about E and "dude."  See,
26  e.g., RT 284-286.

                                            10

1    In October 1998, petitioner worked with Jason Fields, doing car repair.  RT 371.

2  Fields testified petitioner, his girlfriend and their children had come to his house on October 29

3  between 10 and 12; they stayed for about half an hour.  RT 372-373.  Fields saw petitioner later

4  that afternoon, while shopping for Halloween costumes.  Petitioner was in a car with other

5  people.  RT 374.

6    Cooper testified that around 1 p.m. they stopped at Jason's house, where they

7  stayed an hour.  RT 49.  From there, they stopped in to visit petitioner's mother, Barbara Dixon.

8  Id.  After about an hour, they all went shopping until about 9:00 that evening.  RT 50.

9    When Cooper spoke with police within weeks of the homicide, she told them that

10  right after petitioner had dropped Brianna at home, he and Jason had gone to the wrecking yard

11  to get some parts for petitioner's Mustang and returned home between 2:30 and 3:00 p.m.

12  RT 52, 54.  She also told police that the family went to Dixon's home and then, as a group, they

13  went shopping.  RT 54.  She testified she had the days mixed up when she spoke to the detective.

14  RT 53.  When she first spoke to the police, she did not know Dennis had been killed.

15    Later, when she was trying to reconstruct their activities on October 29, she got a

16  note from Brianna's teacher, saying petitioner had picked Brianna up from school and gave it and

17  the receipts to Dixon.  RT 58, 61, 269.

18    According to Enriquez, when Bush learned detectives were going to talk to

19  Enriquez, Bush asked Enriquez to say that Bush was sad and crying when they met up on

20  October 29.  RT 552.  Bush also told him petitioner was not involved.  RT 553.  Bush countered

21  that he did not tell Enriquez the police had the wrong guy and did not ask Enriquez to lie for him.

22  Enriquez did ask Bush what had happened on October 29, but Bush changed the subject.

23  RT 247.

24    Bush was arrested on December 26 and when waiting for court, came across

25  Daniel Cooper, Denise's brother, whom he had met at the Sunnyslope Apartments.  RT 239, 266.

26  Daniel Cooper had been arrested for bringing a knife to the courthouse and was put on a bench

1   with Bush.  RT 397.  Bush told Daniel that he "shot the dude in the head."  RT 399.  Two days

2   after he got out of juvenile hall, Daniel told Denise Cooper what Bush had said.  RT 408.  In

3   contrast, Bush testified that petitioner was also in the holding area and told Daniel that Bush was

4   snitching.  Bush denied telling Cooper they had the wrong guy or that he had shot Dennis.

5   RT 241.

6   III.  Standards Under The AEDPA

7           An application for a writ of habeas corpus by a person in custody under a

8   judgment of a state court can be granted only for violations of the Constitution or laws of the

9   United States.  28 U.S.C. § 2254(a).  Federal habeas corpus relief also is not available for any

10  claim decided on the merits in state court proceedings unless the state court's adjudication of the

11  claim:

12          (1) resulted in a decision that was contrary to, or involved an
            unreasonable application of, clearly established federal law, as
13          determined by the Supreme Court of the United States; or

14          (2) resulted in a decision that was based on an unreasonable
            determination of the facts in light of the evidence presented in the
15          State court proceeding.

16  28 U.S.C. § 2254(d) (referenced herein in as " 2254(d)" or "AEDPA").  See Ramirez v. Castro,

17  365 F.3d 755, 773-75 (9th Cir. 2004) (Ninth Circuit affirmed lower court's grant of habeas relief

18  under 28 U.S.C. § 2254 after determining that petitioner was in custody in violation of his Eighth

19  Amendment rights and that § 2254(d) does not preclude relief); see also Lockyer v. Andrade, 538

20  U.S. 63, 70-71 (2003) (Supreme Court found relief precluded under § 2254(d) and therefore did

21  not address the merits of petitioner's Eighth Amendment claim).[11]  Courts are not required to

22

23          [11]  In Bell v. Jarvis, 236 F.3d 149, 162 (4th Cir. 2000), the Fourth Circuit Court of
        Appeals held in a § 2254 action that "any independent opinions we offer on the merits of
        constitutional claims will have no determinative effect in the case before us . . .  At best, it is
24      constitutional dicta."  However, to the extent Bell stands for the proposition that a § 2254
        petitioner may obtain relief simply by showing that § 2254(d) does not preclude his claim, this
25      court disagrees.  Title 28 U.S.C. § 2254(a) still requires that a habeas petitioner show that he is in
        custody in violation of the Constitution before he or she may obtain habeas relief.  See Lockyer,
26      538 U.S. at 70-71; Ramirez, 365 F.3d at 773-75.

1    address the merits of a particular claim, but may simply deny a habeas application on the ground

2    that relief is precluded by 28 U.S.C. § 2254(d).  Lockyer, 538 U.S. at 71 (overruling Van Tran v.

3    Lindsey, 212 F.3d 1143, 1154-55 (9th Cir. 2000) in which the Ninth Circuit required district

4    courts to review state court decisions for error before determining whether relief is precluded by

5    § 2254(d)).  It is the habeas petitioner's burden to show he is not precluded from obtaining relief

6    by § 2254(d).  See Woodford v. Visciotti, 537 U.S. 19, 25 (2002).

7              The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are

8    different.  As the Supreme Court has explained:

9                      A federal habeas court may issue the writ under the "contrary to"
                       clause if the state court applies a rule different from the governing
10                     law set forth in our cases, or if it decides a case differently than we
                       have done on a set of materially indistinguishable facts.  The court
11                     may grant relief under the "unreasonable application" clause if the
                       state court correctly identifies the governing legal principle from
12                     our decisions but unreasonably applies it to the facts of the
                       particular case.  The focus of the latter inquiry is on whether the
13                     state court's application of clearly established federal law is
                       objectively unreasonable, and we stressed in Williams [v. Taylor,
14                     529 U.S. 362 (2000)] that an unreasonable application is different
                       from an incorrect one.

15

16    Bell v. Cone, 535 U.S. 685, 694 (2002).  A state court does not apply a rule different from the

17    law set forth in Supreme Court cases, or unreasonably apply such law, if the state court simply

18    fails to cite or fails to indicate an awareness of federal law.  Early v. Packer, 537 U.S. 3, 8

19    (2002).

20              The court will look to the last reasoned state court decision in determining

21    whether the law applied to a particular claim by the state courts was contrary to the law set forth

22    in the cases of the United States Supreme Court or whether an unreasonable application of such

23    law has occurred.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002), cert. dismissed, 538 U.S.

24    919 (2003).  Where the state court fails to give any reasoning whatsoever in support of the denial

25    of a claim arising under Constitutional or federal law, the Ninth Circuit has held that this court

26    must perform an independent review of the record to ascertain whether the state court decision

1  was objectively unreasonable.  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  In other

2  words, the court assumes the state court applied the correct law, and analyzes whether the

3  decision of the state court was based on an objectively unreasonable application of that law.

4        It is appropriate to look to lower federal court decisions to determine what law has

5  been "clearly established" by the Supreme Court and the reasonableness of a particular

6  application of that law.  See Duhaime v. Ducharme, 200 F.3d 597, 598 (9th Cir. 1999).

7  IV.  Ineffective Assistance of Counsel

8        Petitioner argues that trial counsel was ineffective for a number of reasons.[12]

9        The federal law on claims of attorney ineffectiveness is clear:

10           First, the defendant must show that counsel's performance was
             deficient.  This requires showing that counsel made errors so
11           serious that counsel was not functioning as the 'counsel'
             guaranteed by the Sixth Amendment.  Second, the defendant must
12           show that the deficient performance prejudiced the defense.

13  Strickland v. Washington, 466 U.S. 668, 687 (1984).  "[T]he performance inquiry must be

14  whether counsel's assistance was reasonable considering all the circumstances."  Id. at 688.  This

15  court must "strongly presume that counsel's conduct was within the wide range of reasonable

16  assistance, and that he exercised acceptable professional judgment in all significant decisions

17  made."  Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1990) (citing Strickland, 466 U.S. at 689).

18        It is also petitioner's burden to establish prejudice:  "A defendant must show that

19  there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

20  proceeding would have been different.  A reasonable probability is a probability sufficient to

21  undermine confidence in the outcome."  Strickland, 466 U.S. at 694.  This evaluation must be

22  based on the totality of the evidence before the jury, recognizing the probability of a different

23

24        [12]  Respondent argues that this claim, or at least the portion based on the claim that
        counsel failed to present Dixon as a witness, is barred because the superior court denied the writ
        as successive.  Answer ¶ 6.  However, a district court may reach the merits of a habeas
25      petitioner's claim where, as here, the merits are "easily resolvable against the petitioner whereas
        the procedural-bar issue involve[s] complicated issues of state law."  Lambrix v. Singletary, 520
26      U.S. 518, 525 (1997).

1  outcome is less likely in a case "with overwhelming record support." Id. at 695, 696.  A

2  reviewing court "need not determine whether counsel's performance was deficient before

3  examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . If it

4  is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . .

5  that course should be followed." Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002) (quoting

6  Strickland, 466 U.S. at 697).

7         Petitioner cannot bear his burden of showing ineffective assistance of counsel by

8  presenting "mere conclusory statements," United States v. Schaflander, 743 F.2d 714, 721 (9th

9  Cir. 1984), but rather must tender affidavits from the witnesses counsel neglected to interview or

10  call, showing the "helpful testimony for the defense" they could have presented.

11  Dows v. Wood, 211 F.3d 480, 486 (9th Cir. 2000); Bragg v. Galaza, 242 F.3d 1082, 1088 (9th

12  Cir. 2001).

13         A.  Alibi

14         Petitioner raised this argument in his state court writs.  The last reasoned opinion

15  is that issued by the Sacramento County Superior Court on December 22, 2003:

16         Petitioner first claims that trial counsel was ineffective in failing to
       call Barbara Dixon as a witness, who he claims was with him at a
17         store during the time of the crime, as evidenced by a store receipt,
       and as would be evidenced by a video surveillance tape.  He claims
18         that establishes alibi, which impliedly establishes factual
       innocence.[13]

19
       This is a repeat of the same claim in petitioner's first habeas
20         petition.  This time petitioner attaches a statement signed by
       Barbara Dixon on July 3, 2001, stating that she, petitioner, and
21         Denise Cooper were shopping on October 29, 1998 around the
       time of the crime, and received a 1:00 receipt for purchases, which
22         she gave to the first trial attorney, plus the name and number of the
       store employee, and that she apprised petitioner's second trial
23         attorney of this and of her willingness to testify and the store
       employee's willingness to testify, and that there possibly was a
24         surveillance tape of the store and giving of the store receipt, but

25  ─────────────────

26     [13]  The superior court found the writ to be successive and so considered whether
    petitioner's implied claim of factual innocence provided a basis for considering the merits.

15

she was never called at trial by the second attorney.  The statement, however, was not signed under penalty of perjury, and does not qualify as a declaration under oath.  Petitioner also attaches copies of several receipts, none of which is from October 29, 1998 at 1:00.  One of the receipts is from October 29, 1998, but at 5:19 p.m., hours after the crime; it may be the receipt admitted at trial as Exhibit V-1.  Another receipt contains only numbers and no other identification or anything decipherable; it does say "23:19" and "23:25," but that is meaningless without any other identifying marks on it.  Nor does Dixon's unsworn statement identify any of these receipts as the one she received on October 29, 1998 at 1:00 p.m.  Nor does petitioner attach any other affidavit, sworn or unsworn, from any other potential witness.  Instead, petitioner attaches only hearsay statements from investigators and portions of transcripts, apparently from trial or some other court hearing, and police reports of more hearsay statements.

None of this establishes any competent evidence that petitioner is factually innocent because he was not present at the shooting at noon on October 29, 1998.  Even if Dixon's statement were competent evidence, which it is not because it is not sworn under penalty of perjury, it does not show unerringly that petitioner physically could not have committed the shooting and an hour later been at the store shopping with her. . . .  In this case, the evidence was very strong of petitioner's guilt, including testimony from another occupant of the car at the time petitioner was sitting in the rear of the car and fired the fatal shot into its driver, as well as from a plethora of other witnesses.  Further, Denise Cooper did testify at trial, having been called by both the prosecution and the defense. . . .

Nor does it establish a prima facie case for relief, in any event.  Even if Dixon's statement had been properly sworn under penalty of perjury, it would not require habeas corpus relief.  Had Dixon been called to testify at trial, it would not have made any difference in the outcome, due to the strength of the prosecution evidence against petitioner.  As such, the claim fails in any event under Strickland v. Washington (1984) 466 U.S. 668. . . .

Petitioner next claims that trial counsel was ineffective in failing to investigate and call to the stand a crucial alibi eyewitness who was willing to testify on his behalf.  Petitioner, however, fails to attach a declaration under oath from this alleged alibi eyewitness, that would state what the witness would have testified to had he or she been called to the stand at trial. . . . [T]he claim fails under Strickland . . . .

/////

/////

Petitioner also again claims, as he did in his first petition, that his trial counsel was ineffective in not obtaining and presenting a security tape from the mall to show that he was there at the time of the crime, instead of in the car shooting the victim. . . . [P]etitioner's failure to attach the videotape to this petition . . . requir[es] denial under <u>Strickland</u>. . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Petitioner next claims that trial counsel was ineffective in not introducing at trial an alleged receipt from noon on the day of the crime, which he claims is Exhibit D which he has numbered page 104.  Again, as explained above, the receipt contains only numbers and no other identification or anything decipherable; it does say "23:19" and "23:25," but that is meaningless without any other identifying marks on it.  Nor does petitioner attach any competent declaration under oath identifying it. . . . [I]t also fails under <u>Strickland</u>. . . .

Lodg. Doc. 13 at 2-4.[14]

As the superior court noted, petitioner has provided neither an affidavit from the store clerk nor a copy of the store's video.  Instead, he has attached a copy of a report from an investigator to trial counsel, outlining the steps he had taken to "validate Clients statement about the shopping on the 29th" (reproduced as in original).  The investigator informed counsel that he was trying to reach an employee who no longer worked at a store where petitioner allegedly purchased a leather jacket and asked if counsel wanted to pursue the security video from that store.  Pet. at 32-33.[15]  Petitioner has not shown that the store employee or the security video would have been "helpful . . . for the defense" and so has not borne his burden of demonstrating prejudice.

/////

---

[14]  Petitioner raised a similar issue in his first state habeas petition; relying on <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), the court denied the writ.  Lodg. Doc. 11 at 1-2.

[15]  The court relies on the page numbers assigned to the petition and its exhibits by its CM/ECF system.

1        Petitioner has provided a copy of a statement from Barbara Dixon, who explains

2   that she told petitioner's trial counsel she had been shopping with petitioner and Denise Cooper

3   at the time of the shooting, that she had a receipt reflecting purchases at that time, and that she

4   was willing to testify but was never called as a witness.  Pet. at 29.[16]  He has not provided a copy

5   of the receipt, which he claims shows he was shopping at 1:00 p.m., but has included copies of

6   additional receipts, one of which shows a purchase at K-Mart at 5:19 p.m. on October 29, 1998.

7   Pet. at 43.[17]

8        In Luna v. Cambra, 306 F.3d 954, 958, 961 (9th Cir. 2002), Luna's "sole defense

9   was that he was at his mother's asleep" at 3:00 a.m., the time of the crime," a defense presented

10  through his testimony alone.  His mother and sister were prepared to testify that they lived with

11  Luna and six others in a small, one bedroom house and that they would have been awakened if

12  Luna had come and gone during the night, yet counsel never contacted them.  Id. at 958-59.  The

13  court found that counsel was ineffective and that his failure to call these witnesses prejudiced the

14  defense: the two witnesses could have testified, consistent with Luna's testimony, that he went to

15  sleep at home the night before the crime, that he was at home when they awoke the next morning,

16  and that they would have awakened if Luna had left during the night.  Because this testimony

17  would have buttressed Luna's, the omission was prejudicial.  Id. at 962; see also Brown v.

18  Myers, 137 F.3d 1154, 1157-58 (9th Cir. 1998) (failure to call witnesses to corroborate alibi was

19  prejudicial).

20  /////

21

22      [16]  This statement purports to be notarized, but the court has some question about its
    regularity.  Although the notary attests that Dixon appeared before him on July 3, 2001 (which is
23  when the document was signed), the notary identifies the document as an "agreement letter" and
    lists the date of the document as "10-29-98."
24
        [17]  None of the other receipts are from October 29, 1998.  It also appears that petitioner
25  selected portions of his state writ to attach to the instant petition.  The document he refers to as a
    receipt was not selected for inclusion; it can be found at Lodg. Doc. 13 at 104 (hand written
26  number, not in consecutive order).

1         In <u>Hart v. Gomez</u>, 174 F.3d 1067 (9th Cir. 1999), Hart's daughter testified that

2 Hart molested her when the family visited R Ranch, but did not molest her when another adult

3 was present during these excursions.  Kendall, Hart's girlfriend, testified that she accompanied

4 Hart on the weekends the daughter alleged the molestations had occurred.  Kendall showed

5 counsel credit card receipts showing she had stayed at a motel in the area the night before she and

6 Hart picked up his daughter and that she had purchased groceries in the area of R Ranch during

7 the times in questions.  Counsel did not introduce these receipts.  The Ninth Circuit found this

8 failure to constitute ineffective assistance of counsel because Kendall's evidence, if believed,

9 would have established that no molestation occurred despite the daughter's testimony.  <u>Id</u>. at

10 1070.  As the court noted, because counsel made the strategic determination to rely on a claim

11 that another adult was present during the weekends the daughter alleged she was molested, "it is

12 simply inconceivable that defense counsel's decision not to introduce documentary evidence

13 fully *corroborating* Kendall's testimony was a strategic one."  <u>Id</u>. at 1071 (emphasis in original).

14         This case is not like <u>Luna</u>.  It is true that counsel made a strategic decision to rely

15 on an alibi defense, but he presented it through the testimony of two witnesses, Cooper,

16 petitioner's girlfriend, and Fields, his business partner.  Unlike in <u>Luna</u>, counsel's decision not to

17 call Dixon did not mean that the alibi defense was unsupported.  Also, unlike in <u>Luna</u>, counsel

18 talked to Dixon, as Dixon's own statement acknowledged.  <u>See</u> Pet. at 29 ("I had informed Mr.

19 Dudek of this information and was told I would be a subpeoned [sic] witness.").  As the Ninth

20 Circuit has recognized, "[f]ew decisions a lawyer makes draw so heavily on professional

21 judgment as to whether or not to proffer a witness at trial," but that "where a lawyer [who has not

22 interviewed a witness] . . . does not put a witness on the stand, his decision will be entitled to less

23 deference than if he interviews the witness."  <u>Lord v. Wood</u>, 184 F.3d 1083, 1095 & n.8 (9th Cir.

24 1999).  In this case, trial counsel's decision was not made in a vacuum, for he had talked to

25 Dixon about her potential contribution to the alibi defense.

26 /////

1          Moreover, this case is not like <u>Hart</u>.  Even assuming petitioner had properly

2  supported this petition with the document he claims is a receipt from October 29, 1998, it was

3  not the sort of clearly corroborating evidence present in <u>Hart</u>: as the state court properly

4  observed, if the "receipt" (if that is what it is) gives any time at all, it is at about 11:30 in the

5  evening.  Lodged Doc. 13 at 2, 4.

6          Accordingly, the state court did not apply federal law unreasonably in rejecting

7  the claim that counsel was ineffective in failing to support petitioner's alibi.

8                    B.  <u>Shawn Brown As Shooter</u>[18]

9          Police recovered a pager in a black jacket found near the scene of the shooting.

10  RT 99.  The prosecution secured records for the pager, which was registered to Shawn Brown

11  and Katrina Sheppard.  Pet. at 35.  Trial counsel's investigator talked to Brown and Sheppard,

12  who said they had not carried pagers with the number assigned to the pager found at the scene in

13  their now-defunct pager business.  <u>Id</u>. at 40-41.  In addition, someone named Shawn Brown had

14  several nicknames beginning with "B."  <u>Id</u>. at 35-36.

15          Petitioner argues that trial counsel was ineffective in failing to investigate

16  Brown's culpability as the shooter and to present this evidence at trial.  He also suggests that

17  counsel was ineffective in failing to investigate Jeff P., a drug dealer with whom Dennis had

18  some confrontations, as the shooter.  <u>See</u> Pet. at 39 (portion of police report; a Ms. Dupaty told

19  police that Dennis had running feud with Jeff P.).

20  /////

21  /////

22  _____

23  [18]  Determining what ground petitioner has raised with respect to Brown is not easy.  As
counsel for respondent has noted, in the form petition itself, petitioner refers the reader to pages 2
24  to 11 and 18 to 19 of Attachment A, which is a portion of his last state habeas, and to Attachment
B, which is a portion of the brief filed in the Court of Appeal.  Answer at 11 n.3.  Based on his
25  interpretation of the grounds raised, counsel has not addressed the remaining portions of
petitioner's ineffective assistance of counsel claim nor the other claims contained in the attached
26  pages of the state writ.  Because it appears that petitioner is attempting to raise these issues, the
court will discuss them.

1    The Sacramento County Superior Court rejected this claim:

2    Petitioner next claims that trial counsel was ineffective in failing to
     bring forth evidence that Shawn Brown and not petitioner was the
3    actual shooter.  Petitioner, however, fails to attach any reasonably
     available competent evidence to show that Shawn Brown was in
4    fact the actual shooter and not petitioner.  This claim . . .fails in any
     event under Strickland. . . .
5

6    Lodg. Doc. 13 at 4.

7    One of counsel's duties is investigation, but "the duty to investigate and prepare a

8    defense is not limitless . . . ." Bragg v. Galaza, 242 F.3d 1082, 1088 (9th Cir. 2001).  A "failure

9    to investigate is particularly egregious when a defense attorney fails to consider potentially

10   exculpatory evidence."  Rios v. Rocha, 299 F.3d 796, 805 (9th Cir. 2002); see also Sanders v.

11   Ratelle, 21 F.3d 1446, 1459 (9th Cir. 1994).  Nevertheless, when a habeas petitioner claims that

12   counsel was ineffective for failing to investigate, it is his burden to provide "sufficiently precise

13   information, that is, 'a comprehensive showing as to what the investigation would have

14   produced.'" U.S. ex rel. Simmons v. Gramley, 915 F.2d 1128, 1133 (7th Cir. 1990).

15   The superior court's resolution of this question was not an unreasonable

16   application of Strickland.  Petitioner's attachments show only that Shawn Brown was linked to a

17   pager found near the scene of the shooting and that a Shawn Brown (though not necessarily the

18   Shawn Brown linked to the pager) had several nicknames beginning with B.  He has presented

19   nothing showing that anyone named Shawn Brown (as opposed to a pager) was at the scene of

20   the shooting on October 29, 1998, or that anyone named Shawn Brown had a motive for killing

21   Dennis.  He has presented even less about Jeff P., for he has attached only a portion of a police

22   report containing Ms. Dupaty's description of a feud between Jeff P. and Dennis.

23   C.  Failure To Use Photographs

24   Petitioner also claims counsel was ineffective because he "didn't take any photo's

25   of any importance or aid of his defence" (reproduced as in original).  Pet. at 20.  He alleges

26   counsel did not take pictures that would contradict the prosecution's photographs, but does not

21

1  otherwise explain the relevance of those photos he thought necessary.  Id.  He has also attached a

2  number of photographs, but does not explain whether these were introduced in evidence or ones

3  he believes counsel should have presented.  Id. at 48-50; Supplement to Pet. (Docket No. 1-2) at

4  29, 38.

5        The superior court found no basis for habeas relief:

6             Petitioner next claims that trial counsel did not take any
              photographs to aid his defense. . . . Nor does he establish a prima
7             facie case for relief in any event, as he fails to attach any
              photograph that should have been introduced that would have
8             made any difference in the outcome of the trial, requiring denial
              under Strickland . . . . .
9

10  Lodg. Doc. 13 at 4.

11        "Decisions regarding what evidence should be submitted to prove a defense

12  theory are committed to the sound discretion of trial counsel."  Underdahl v. Carlson, 381 F.3d

13  740, 743 (8th Cir. 2004).  Counsel's decision to rely on testimony, rather than pictures, to present

14  the defense falls within this general rule.  Id.; see also Hunter v. Secretary, Department of

15  Corrections, 395 F.3d 1196, 1204-05 (11th Cir. 2005).

16        Petitioner's vague argument that counsel should have used pictures, apparently to

17  illustrate weaknesses in the testimony of various witnesses, does not undercut the presumption

18  that counsel acted properly in deciding against the use of photographs during the defense

19  presentation.  The vague argument also fails to establish prejudice: petitioner has not shown a

20  reasonable likelihood that the verdict would have been different if the jury had been given

21  additional pictures of the Sunnyslope Apartments and the crime scene.  The state court thus did

22  not apply the Strickland standard unreasonably.

23  /////

24  /////

25

26

22

D.  Failure To Object To Leading Questions[19]

Petitioner argues that trial counsel was ineffective "by allowing the prosecution to guide his witnesses . . . with leading questions" and "failing to impeach their credibility . . . with investigative reports . . ." Pet. at 11.  Respondent argues that even though the claim is not exhausted, this court may address it because it has no merit.  Answer at 16.

Generally, the exhaustion of state court remedies is a prerequisite to the granting of a petition for writ of habeas corpus.  28 U.S.C. § 2254(b)(1).  Nevertheless, this court may proceed "when it is perfectly clear that the petitioner has no chance of obtaining relief." Cassett v. Stewart, 406 F.3d 614, 624 (9th Cir. 2005), cert. denied, Schriro v. Cassett, 546 U.S. 1172 (2006).

In this case, petitioner did not present this issue to the California Supreme Court in either of his state habeas petitions or on direct appeal.  See Lodg. Docs. 8 (Petition for Review) & 16 (Supreme Court petition).  Nevertheless, this court finds it is perfectly clear that petitioner cannot obtain relief.

It is petitioner's burden to show "his custody is in violation of the Constitution . . . ." Silva v. Woodford, 279 F.3d 825, 835 (9th Cir. 2002).  As part of his ultimate burden of proof on habeas issues, petitioner must provide citations to the record to support his claims. Gerlaugh v. Lewis, 898 F.Supp. 1388, 1423 (D. Ariz. 1995).

The factual statement supporting this claim of error does not refer the court to any portion of the transcript showing that the prosecutor asked leading questions.  Nor does it designate any portion of police reports as those counsel should have used to impeach witnesses. Instead, it refers only to "petitioner's belief that the failure of trial counsel to make timely objections and to use police reports. . . .constituted ineffective assistance of counsel. . . ." Pet. at 11.

---

[19]  This is the third issue listed independently in the attachment to the federal writ and not part of the issues incorporated from the state writs and appeals.  Pet. at 11.

1          Even if petitioner had directed the court's attention to relevant portions of the

2  transcript, it is unlikely he could prevail: "failure to object to leading questions . . . is generally a

3  matter of trial strategy as to which we will not second guess counsel." Burnett v. Collins, 982

4  F.2d 922, 930 (5th Cir. 1993); Flores v. Keane, 211 F.Supp.2d 426, 441 (S.D.N.Y. 2001).

5  Moreover, petitioner has not explained how objections to leading questions had an impact on the

6  ultimate outcome of the trial, particularly because leading questions "could have been simply

7  rephrased." Burnett, 982 F.2d at 930.; see also United States v. Bosch, 914 F.2d. 1239, 1246 (9th

8  Cir. 1990) (appellant failed to show that testimony would not have been admissible if not elicited

9  through leading questions).

10         Similarly, trial counsel's decision on how best to impeach a witness is generally

11  deemed a strategic one, shielded by the Strickland presumption that counsel acted reasonably.

12  United States v. Lindsay, 157 F.3d 532, 535-36 (7th Cir. 1998); but see Reynoso v. Giurbino,

13  462 F.3d 1099, 1114 (9th Cir. 2006) (failure to impeach crucial witnesses constituted ineffective

14  assistance of counsel). Petitioner has presented nothing that rebuts this presumption. Moreover,

15  a quick review of the record shows that counsel did use the preliminary hearing transcript and

16  police reports to impeach Bush, one of the prosecution's most important witnesses. See, e.g., RT

17  213 (police report), 263 (preliminary hearing transcript).

18  V.  Superior Court's Error In Handling Habeas Petitions

19         Petitioner urges that the superior court erred in finding petitioner had failed to

20  establish a prima facie case for relief in his state collateral attacks. Pet. at 10; see Lodg. Doc. 11

21  at 1. However, procedural errors made in state post-conviction proceedings do not state a claim

22  for habeas relief. See Ortiz v. Stewart, 149 F.3d 923, 939 (9th Cir. 1998) (habeas relief not

23  available to redress errors in post-conviction proceedings). Moreover, because this court has not

24  found that any of the issues petitioner raised on state habeas are meritorious, the state court's

25  resolution of the questions is not an independent basis for relief.

26  /////

1   VI.  Perjured Testimony

2           Petitioner contends that his conviction is based on perjured testimony, basing this

3   claim on internal contradictions in Bush's and Era Marshall's testimony as well as differences

4   between these witnesses' testimony and that of other witnesses.  Pet. at 22-24.  For example, he

5   notes that Era Marshall may have told police she saw Bush with the gun, but at trial identified

6   petitioner (whom, she claimed, looked something like Bush) as the person with the gun.  See RT

7   345-346.  He observes also that Bush testified that petitioner stopped to talk to someone as he

8   was fleeing the scene of the crime, a fact he had not mentioned to the police or during the

9   preliminary hearing.  See RT 185.  Relying on these and many other such examples, petitioner

10  argues that the testimony was perjured.

11          The superior court rejected this claim:

12          . . . [Petitioner] bases this entirely, however, on contradictions in
            actual testimony given at trial and the preliminary hearing, and
13          with then-available police reports, and not with any new evidence
            to show any falsity.  The jury was already aware of the
14          inconsistencies, and determined that petitioner was guilty based
            [on] its evaluation of the testimony before it.
15

16  Lodg. Doc. 13 at 4-5.

17          A conviction violates the Fourteenth Amendment if it is obtained by the use of

18  perjured testimony the prosecutor knows to be false.  Napue v. Illinois, 360 U.S. 264 (1959).  It is

19  petitioner's burden to demonstrate the challenged testimony was false, the false testimony was

20  material, and the prosecutor knew the testimony was false when it was presented.  Chambers v.

21  Johnson, 218 F.3d 360, 363-64 (5th Cir. 2000).  A witness "gives false testimony concerning a

22  material matter with the willful intent to provide false testimony, rather than as a result of

23  confusion, mistake, or faulty memory."  United States v. Dunnigan, 507 U.S. 87, 94 (1993).  Not

24  every discrepancy in testimony translates into perjury.  Lambert v. Blackwell, 387 F.3d 210, 249

25  (3d Cir. 2004).

26  /////

1    As the superior court observed, petitioner has not borne his burden of showing

2  that the testimony given by Era Marshall and Jonathan Bush was false.  It was, perhaps,

3  contradictory, at times, but this does not "translate[] into perjury."

4  VII.  Sufficiency Of The Evidence

5    Petitioner argues the evidence was insufficient to sustain his conviction because

6  of the unreliability of Bush's testimony and the internal contradictions in Era Marshall's

7  testimony.  Pet. at 25-27.

8    The superior court also rejected this claim:

9    Petitioner next claims that the evidence was insufficient to show
     guilt beyond a reasonable doubt.  . . . Nor does petitioner state a
10   prima facie case for relief . . . as the evidence, as summarized by
     the Third District Court of Appeal in its opinion affirming the
11   judgment, was more than sufficient to establish guilt beyond a
     reasonable doubt.

12

13  Lodg. Doc. 13 at 5.

14    The Due Process Clause of the Fourteenth Amendment "protects the accused

15  against conviction except upon proof beyond a reasonable doubt of every fact necessary to

16  constitute the crime with which he is charged."  In re Winship, 397 U.S. 358, 364 (1970).  There

17  is sufficient evidence to support a conviction if, "after viewing the evidence in the light most

18  favorable to the prosecution, any rational trier of fact could have found the essential elements of

19  the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also

20  Prantil v. California, 843 F.2d 314, 316 (9th Cir. 1988).  A petitioner in a federal habeas corpus

21  proceeding "faces a heavy burden when challenging the sufficiency of the evidence used to

22  obtain a state conviction on federal due process grounds," because the court must apply the

23  Jackson standard with an extra layer of deference to the state court's determination, as mandated

24  by the AEDPA. Juan H. v. Allen, 408 F.3d 1262, 1274-75 (9th Cir. 2005), cert. denied, 546 U.S.

25  1137 (2006).  In order to grant the writ, the habeas court must find that the decision of the state

26  /////

26

1   court reflected an objectively unreasonable application of Jackson and Winship to the facts of the

2   case.  Id. at 1275.

3          It is the province of the jury to "resolve conflicts in the testimony, to weigh the

4   evidence, and to draw reasonable inferences from basic facts to ultimate facts."  Jackson, 443

5   U.S. at 319.  If the trier of fact could draw conflicting inferences from the evidence, the court in

6   its review will assign the inference that favors conviction.  McMillan v. Gomez, 19 F.3d 465,

7   469 (9th Cir. 1994); see also Roehler v. Borg, 945 F.2d 303, 306 (9th Cir. 1991).  As the Ninth

8   Circuit has recognized, the trier of fact's credibility determination is entitled to near total

9   deference under Jackson.  Bruce v. Terhune, 376 F.3d 950, 957 (9th Cir. 2004).

10         The state court did not apply Jackson unreasonably, for resolving the

11  contradictions and disputes in the testimony in favor of the prosecution, the evidence was more

12  than sufficient.  Bush testified that Dennis arrived at the Sunnyslope Apartments, looking for

13  marijuana; that he was concerned about petitioner's involvement in this transaction because of

14  the prior bad blood between them; that petitioner allayed Dennis's fears by assuring him "it's

15  cool"; that petitioner left the area before ultimately getting into Dennis' car; that as Bush heard a

16  shot, petitioner said "it's not never cool"; that as he got out of the car, he saw petitioner with a

17  gun; that as he, Carter and petitioner fled the scene, petitioner directed them to take their outer

18  clothing off and told them not to say anything.  RT 170, 172, 180-181, 187, 188, 191, 215.  Era

19  Marshall testified that from her vantage point in her front yard, she could see petitioner, who was

20  sitting in the back seat of a white car, shoot Dennis, who was driving.  She also described seeing

21  petitioner tuck the gun in the back waistband of his pants as he left the area.  RT 322, 326, 329,

22  340, 345.  This evidence is ample support for the verdict and is set out in the Court of Appeal's

23  decision.  Lodg. Doc. 9 at 2-7.

24  /////

25  /////

26  /////

1 VIII.  <u>Jury Misconduct</u>;

2           Petitioner alleges that in the presence of the jurors and prosecution and defense

3 witnesses, the victim's mother cursed at petitioner and his family and accused them of the crime.

4 Pet. at 20.  He claims that counsel failed to object or otherwise bring this incident to the court's

5 attention, even though petitioner asked him to do so.  <u>Id</u>.  He also presents this as a separate

6 issue, arguing that the outbursts tainted the jury.  <u>Id</u>. at 20, 28.

7           The superior court rejected this claim of error as well:

8           Petitioner next again claims that there was error because the
          victim's family made comments that were overheard by jurors. . . .
9           [P]etitioner again, as he did in the first petition, fails to attach any
          reasonably available documentary evidence regarding this claim. . .
10          .

11 Lodg. Doc. 13 at 4.[20]  Once again, as the state court observed, petitioner has not borne his burden

12 of showing there was in fact an outburst that counsel should have investigated or that would have

13 had a prohibited impact on the jury.  <u>See</u> <u>James v. Borg</u>, 24 F.3d 20, 26 (9th Cir. 1994)

14 ("Conclusory allegations which are not supported by a statement of specific facts do not warrant

15 habeas relief.").

16           Moreover, even had petitioner supported his claim, he would not be able to show

17 prejudice from the outburst or counsel's failure to investigate or seek some sort of relief.  In

18 <u>Whitehead v. Cowan</u>, 263 F.3d 708 (7th Cir. 2001), the judge left the courtroom while the

19 victim's mother was on the stand; in the judge's absence, the mother began to shout at the

20 /////

21 /////

22 /////

23

24           [20]  On December 22, 2000, the superior court rejected petitioner's claim that trial counsel
failed to investigate and object to the jury's exposure to imprecations from the victim's mother;
25 the court found that petitioner's account of the alleged cursing was hearsay and not supported by
an affidavit of anyone who heard the outburst.  Lodg. Doc. 11 at 2.  Neither court explicitly
26 addressed the substantive claim, divorced from the ineffective assistance of counsel aspect.

1  defendant, asking why he had killed her daughter.  The Court of Appeal found this incident did

2  not warrant habeas relief:

3       Any jury would expect that a close relative of the victim would
        have strong emotions toward the suspected killer.  The outburst
4       directed at the accused in the presence of the jury did not provide
        any information not admitted at trial that could indicate guilt or
5       innocence.  Unfortunate as the event was, it was not an error that
        automatically requires a new trial.

6

7  Id. at 723; see also Bible v. Schriro, 497 F.Supp.2d 991 (D. Az. 2007) (as he left the courtroom,

8  victim's father yelled an obscenity at petitioner).

9       Petitioner relies on Remmer v. United States, 347 U.S. 227 (1954) (Remmer I).

10  In Remmer I, a juror reported that a person told him he could "profit" by voting to acquit the

11  defendant.  The judge reported the contact to the prosecutors, who called the FBI; an agent

12  interviewed the juror during the trial.  The defendant and his counsel learned of this

13  sequence of events only after trial.  The Supreme Court noted:

14       In a criminal case, any private communication, contact, or
         tampering directly or indirectly, with a juror during a trial about the
15       matter pending before the jury is, for obvious reasons, deemed
         presumptively prejudicial, if not made in pursuance of known rules
16       of the court and the instructions and directions of the court made
         during trial, with full knowledge of the parties.

17

18  Remmer I, 347 U.S. at 229.  It remanded the case for a hearing, because, as it explained later in

19  Remmer v. United States, 350 U.S. 377 (1956) (Remmer II), "the paucity of information" in the

20  record made it impossible to determine whether the episode had been harmful or harmless.  Id. at

21  379-80.  Although it was critical of the hearing the district court had conducted by the time of

22  its second decision, the Remmer II court found enough information in the record to resolve the

23  question of prejudice.

24       However, in Whitehead v. Cowan, 263 F.3d at 724, the court suggested Remmer

25  applies only to those cases where the contacts involved jury tampering, which was not present in

26  that case or in this one.  It ultimately found no prejudice because "the mother did not attempt to

persuade the jury, nor did she provide them with any extraneous information about the facts of the case . . . . The mother's outburst was not a purposeful intrusion into the sanctity of the juror's domain." Id. (internal quotations & citations omitted).  This case is the same: the outbursts, if they occurred, were not attempts to persuade the jurors.  The state court's resolution of this issue did not apply federal law unreasonably.

IX.  The Examination Of Era Marshall

Four years before the trial, Era Marshall had suffered a stroke, which deprived her of the faculty of speech.  RT 301, 303.  She could understand questions and make her answers known through gestures.  RT 301.  She was able to make sounds, which her husband could interpret.  RT 303.  She communicated to the court that if her husband interpreted her sounds incorrectly, she would make that clear.  RT 304.

The court then had Exell Marshall sworn to interpret what his wife was saying "to the best of [his] skill and ability."  RT 305-306.  Era Marshall relied on her husband, but also used gestures beyond a shake or nod of her head.  For example, when asked whether she told officers she had seen petitioner with a gun, she pointed to her back, on the right hand side. RT 307.

After this hearing out of the presence of the jury, the court found Era Marshall competent to be a witness and said she could testify by answering yes or no questions.  RT 309. Trial counsel objected, arguing that this procedure denied petitioner the right to confront and cross-examine witnesses.  RT 310.  He further argued that relying on Mr. Marshall as an interpreter did not cure any problem, because he had been a witness already.  RT 311.  Finally, he suggested that Mr. Marshall was not really interpreting, but rather was guessing at his wife's answers.  RT 312.  The court rejected these arguments and suggested that counsel tailor their questions so they could be answered yes or no; if counsel wanted an explanation, "then counsel will have to devise a method . . . to have her answer those questions."  RT 314.

/////

1    During her testimony, Mr. Marshall sometimes asked his wife if he had

2    interpreted her answers correctly.  See, e.g., RT 327.  She let him know when his interpretation

3    was not correct.  See, e.g., RT 356.  Sometimes she wrote her answer.  RT 328.  When a picture

4    of her neighborhood was projected in the courtroom, she used a laser pointer to demonstrate

5    where she was standing when the shooting occurred.  RT 337.  She continued to use gestures

6    beyond a shake or nod of her head: when asked where her husband was right after the shot was

7    fired, she made a crouching motion.  RT 338.

8    Petitioner argues this procedure violated his right to confront and cross-examine

9    Era Marshall and that the use of her husband, who was also a witness in this trial, deprived him

10   of a fair trial.  Pet. at 28.  The superior court found petitioner had not shown he was prejudiced

11   by this procedure.  Lodg. Doc. 13 at 5.

12   "The Confrontation Clause guarantees an opportunity for effective

13   cross-examination, not cross-examination that is effective in whatever way, and to whatever

14   extent, the defense might wish."  Delaware v. Fensterer, 474 U.S. 15, 20, (1985).  "[S]uccessful

15   cross-examination is not the constitutional guarantee."  United States v. Owens, 484 U.S. 554,

16   560 (1988).  In addition, the witness's oath and the jury's opportunity to observe the witness's

17   demeanor satisfy the constitutional right to confrontation.  Id.

18   In Owens, the Supreme Court found no constitutional problem when a witness

19   who had identified the defendant as his assailant was allowed to testify even though he no longer

20   could recall why he made the identification.  Similarly, the Sixth Circuit found a child witness

21   was available for cross-examination even though she simply failed to answer a number of

22   questions and answered others with shrugs or nods.  Bugh v. Mitchell, 329 F.3d 496, 503-04, 507

23   (6th Cir. 2003).  In this case, defense counsel was able to question Era Marshall about her

24   observations, her memory of the event and her earlier statements about the events.  See, e.g.,

25   RT 330, 347, 348.  Even with Mrs. Marshall's limitations, counsel had an opportunity to cross

26   /////

1   examine her; that it was not "effective in whatever way" he wanted does not rise to the level of a

2   constitutional violation.

3           Petitioner has not cited any Supreme Court authority that forbids a relative, even

4   one who has been a witness, from interpreting for another witness.  The lower federal courts have

5   recognized that "matters regarding the use of an interpreter are left to the discretion of the trial

6   court" and "habeas corpus relief is available only if the petitioner can demonstrate the trial

7   court's action denied petitioner a fundamentally fair trial."  Montano v. Shelton, 961 F.Supp.

8   252, 255 (D.Kan. 1997).  In Fairbanks v. Cowan, 551 F.2d 97, 98 (6th Cir. 1977), for example, a

9   father was asked to interpret for his son, who could communicate with guttural sounds; when

10   interpreting the details of the sexual assault on his son, the father began to cry.  The court found

11   no basis for habeas relief.  Similarly, the Fifth Circuit found no error in the district court's

12   reliance on the victim's sister to interpret for a deaf witness who did not use standard sign

13   language, but rather used gestures and grunts.  United States v. Bell, 367 F.3d 452, 463-64 (5th

14   Cir. 2004).  However, the same court did grant habeas relief when a husband interpreted for his

15   deaf wife, who was the victim of an attempted sexual assault: the court recognized the husband's

16   "natural emotions and desires would have been to have defendant convicted. . . ."  Prince v. Beto,

17   426 F.2d 875, 876 (5th Cir. 1970).  An additional factor showed the husband's unsuitability: he

18   had offered to have the prosecution dropped in exchange for a payment of $100.  Id.

19           This case is much different.  Even though Exell Marshall was a witness to the

20   crime and had testified, there is nothing in the record suggesting he was personally interested in

21   the outcome of the case or had any other motive to interpret his wife's answers in any way but

22   impartially.  Moreover, petitioner has not pointed to anything in the record suggesting Mr.

23   Marshall shaded his interpretation to reach a certain result.  He has not demonstrated this

24   procedure violated his right to a fair trial.

25   /////

26   /////

X.   The Admission Of Carter's Statements

Carter told Detective Stevenson petitioner was concerned that Carter would snitch.  RT 285.  Carter also told the detective he feared for his safety and planned to move to Arizona.  RT 286.

At the hearing on the motions in limine, trial counsel objected to the prosecution's use of these statements.  RT 2-4.  The court admitted them, however, under California Evidence Code § 1250 to show Carter had fled not because of his own guilt but because of his fear of petitioner.  RT 7-8.

Petitioner challenges the admission of these statements both on state law and confrontation clause grounds.  Second Supplement to Pet. (Docket No. 1-3) at 13-32.  He also argues counsel "failed to object in a timely fashion" to the use of Carter's out-of-court statements at trial and failed to argue the statements were "those of a self-serving accomplice" or submit any evidence that Carter was Bush's accomplice.  Pet. at 20.

The Court of Appeal rejected petitioner's substantive challenges, finding the state and federal challenges to the admission of the evidence were waived.  First, it found that the challenge on appeal–that Carter was Bush's accomplice in felony murder and robbery and that his statement was thus the self-serving statement of an accomplice–was not the challenge raised at trial, which was based on relevance.  Lodg. Doc. 9 at 10-12.  It also found the confrontation clause argument was waived because defense counsel's challenge had not made specific reference to the federal constitution.  Id. at 14-16.  Petitioner raised his ineffective assistance of counsel claim in his state habeas petition, but none of the courts addressed it.  See Lodg. Doc. 13 at 3 (writ); Lodg. Doc. 16 at 3 (writ).  Accordingly, this court conducts a de novo review of these claims.[21]

/////

---

[21]  Respondent has not addressed this claim in the answer and so has waived any claim of procedural default.  Francis v. Rison, 894 F.2d 353, 355 (9th Cir. 1990).

1    In general, a state court's evidentiary ruling is not subject to federal habeas review

2    unless the ruling violates federal law, either by infringing upon a specific federal constitutional

3    right or statutory provision or by depriving the defendant of the fundamentally fair trial

4    guaranteed by due process.  See Pulley v. Harris, 465 U.S. 37, 41 (1984); Jammal v. Van de

5    Kamp, 926 F.2d 918, 919-20 (9th Cir. 1991).  As explained more fully below, the admission of

6    Carter's statements did not render petitioner's trial fundamentally unfair.

7    Under Confrontation Clause jurisprudence:

> [I]n order to introduce relevant statements at trial, state prosecutors
> [must] either produce the declarants of those statements as
> witnesses at trial or demonstrate their unavailability.  If
> unavailability has been demonstrated, then the proffered
> statements, which are by definition hearsay, must be shown to bear
> an adequate indicia of reliability.  This indicia of reliability may be
> shown in two different ways.  First, if the statements fall within a
> firmly rooted hearsay exception, reliability is established.  In cases
> where the statements do not fall within such a hearsay rule
> exception, the evidence must be excluded absent . . . a showing of
> particularized guarantees of trustworthiness.

14   Whelchel v. Washington, 232 F.3d 1197, 1204 (9th Cir. 2000) (internal quotations and citations

15   omitted).  The state of mind exception, under which Carter's statement was admitted, is a firmly

16   rooted hearsay exception.  Terrovona v. Kincheloe, 852 F.2d 424 (9th Cir. 1988).

17   Petitioner contends that because Carter was Bush's accomplice in the robbery and

18   murder of Dennis, his expressions of fear were self-serving and unreliable.  Second Supplement

19   to Pet. (Docket No. 1-3) at 22.   He also argues, in the alternative, that trial counsel was

20   ineffective in failing to establish Carter's status as an accomplice.  Pet. at 20.  However, even if

21   Carter's statement is deemed unreliable, any error in its admission is harmless.

22   Confrontation Clause violations are subject, as are most constitutional errors, to

23   harmless error review.  Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986).  Accordingly, this

24   court must determine whether the introduction of Carter's statements had a substantial and

25   injurious effect in determining the jury's verdict.  Fry v. Pliler, 551 U.S. __, 127 S.Ct. 2321,

26   2328 (2007); Brecht v. Abrahamson, 507 U.S. 619, 628 (1993).

34

1        A week or so before the shooting, Dennis and his cousin saw petitioner, who held

2 his hand like a gun and simulated firing at Dennis.  RT 67.  In addition, petitioner and Dennis

3 had a history of uncomfortable relations, stemming from Dennis's snakes and the fight between

4 Dennis and petitioner.  RT 25-26, 66-67.

5        Era Marshall testified she saw petitioner shoot Dennis from the back seat of the

6 white car and thereafter saw petitioner tuck the gun into the waistband of his pants.  RT 322, 326,

7 329.  Her husband also saw three people scramble out of the white car after the shooting and

8 observed petitioner, the lighter-skinned of them, put something into his back waistband.  RT 156.

9 The Marshalls' testimony was impeached, it is true, by their differing accounts of where they

10 were during the shooting and their earlier accounts of the direction the three men ran from the

11 car, but their testimony on the essential points was firm.  RT 317-319, 473, 480-481.

12        A different account was presented by Justin Perez, who testified he knew

13 petitioner, was visiting friends on 68th Street and did not see petitioner there after the shooting.

14 RT 422-428.

15        Although Bush did not see the actual shooting, immediately afterwards he saw

16 petitioner holding a gun and heard petitioner say, "That's what that fool gets."  RT 184-187.  As

17 they were running from the car, petitioner told Bush and Carter not to give information to the

18 police, directed them to remove their outer clothing, and said he would claim to have been with

19 his girlfriend the entire time.  RT 188, 191, 198.  Bush also described being approached by some

20 women who, on petitioner's behalf, advised him not to testify.  RT 201, 203.  Bush denied telling

21 Daniel Cooper, Denise's brother, that he, not petitioner, had shot Dennis.  RT 241, 399.

22        Cooper did provide an alibi for petitioner, but was impeached with an earlier

23 statement to the police, in which she had said that after dropping Brianna at the apartment,

24 petitioner had gone out and had not returned until 2:00 or 2:30 p.m.  RT 52, 54.  However,

25 petitioner's alibi was also supported by Jason Fields, who confirmed that petitioner, Cooper and

26 their family had dropped by in the early afternoon of October 29.  RT 372-373.

1    Despite the problems with Bush's and Era Marshall's testimony, they provided a

2    consistent narrative of petitioner as the shooter.  The defense offered a coherent alibi, but one

3    with a number of holes.  Carter's statement added to the mix did not undercut the defense, yet it

4    did not provide strong support for the prosecution.  It provided some corroboration for Bush's

5    account of the aftermath of the shooting, but it was clear from the items of clothing found along

6    the path the men had run that they had attempted to change their appearance as they fled.  In

7    addition, it provided some corroboration for Bush's claim that petitioner sent him a message not

8    to talk, which showed petitioner's consciousness of guilt, but it was not powerful corroboration.

9    In light of the eyewitness testimony and the problems with petitioner's alibi, this court cannot

10   find the admission of Carter's statement had a substantial and injurious effect on the jury's

11   resolution.

12   XI.   The Absence Of Accomplice Instructions

13   Petitioner argues that the trial court erred in failing to instruct the jury that Bush

14   and Carter were accomplices, whose testimony and statements should be viewed with caution

15   and whose uncorroborated testimony could not support the verdict.  Second Supplement to Pet.

16   (Docket No. 1-3) at 27-32.  The Court of Appeal assumed that the court erred, but found the error

17   harmless.  Lodg. Doc. 9 at 16-22.

18   The Supreme Court has held that "[t]he Fourteenth Amendment does not forbid a

19   state court to construe and apply its laws with respect to the evidence of an accomplice."

20   Lisenba v. California, 314 U.S. 219, 227 (1941); see also Harrington v. Nix, 983 F.2d 872, 874

21   (8th Cir. 1993) ("state laws requiring corroboration do not implicate constitutional concerns that

22   can be addressed on habeas review"); Brown v. Collins, 937 F.2d 175, 182 n.12 (5th Cir. 1991)

23   ("the prosecution's failure to satisfy the requirements of the accomplice-witness sufficiency rule,

24   and a state court's failure to enforce that purely state rule, simply would not warrant

25   constitutional attention"); Takacs v. Engle, 768 F.2d 122, 127 (6th Cir.1985) ("If uncorroborated

26   accomplice testimony is sufficient to support a conviction under the Constitution, there can be no

1   constitutional right to instruct the jury that it must find corroboration for an accomplice's

2   testimony.").

3          Petitioner attempts to convert this alleged failure of the court into a federal issue

4   by arguing that once a defendant has met his burden of showing that witnesses were accomplices,

5   the burden then shifts to the prosecution to produce sufficient corroborative evidence.  Second

6   Supplement to Pet. (Docket No. 1-3) at 30-31.  He suggests he has a due process right to

7   accomplice instructions as a result.  If this argument serves to translate this purely state issue into

8   a federal one, it nevertheless fails.

9          In Henderson v. Kibbe, 431 U.S. 145, 155 (1977), the Supreme Court held that a

10   habeas petitioner's burden to show prejudice from the omission of a jury instruction "is

11   especially heavy," because an omission or an incomplete instruction has less potential for

12   prejudice than a misstatement of the law.  In this case, petitioner does not explain how the jury's

13   determination would have been different had the jury been instructed that it could not rely on

14   Bush's and Carter's testimony in the absence of corroboration, for their testimony was certainly

15   corroborated by Era Marshall's eyewitness account of the shooting.

16          Moreover, he fails to explain how an instruction to view their testimony with

17   caution would have had a greater impact than the general credibility instructions in this case,

18   which told the jury that in assessing a witness's credibility, it must consider "the existence . . . of

19   a bias, interest or other motive."  RT 650.  Had the jury believed that Bush and Carter were

20   accomplices, it would have applied this instruction in evaluating their credibility.

21          The state court's resolution of this question did not contravene clearly established

22   federal law.

23   XII.  Ex Post Facto

24          In addition to his twenty-five-year-to-life sentence for the murder, petitioner

25   received an additional twenty-five-year-to-life enhancement for the use of a firearm causing

26   death under California Penal Code § 12022.53(d).  CT 205; RT 697.  Under a former version of

1   the statute, the enhancement could be imposed if use of a firearm had resulted in great bodily

2   injury.  On September 28, 1998, the statute was amended to apply to anyone who caused death by

3   use of a firearm; this amendment was adopted in urgency legislation, effective immediately.

4   Petitioner alleges the amendment was not a proper subject for urgency legislation and so under

5   the usual rules of statutory adoption, should have taken effect on January 1, 1999.  Cal. Const.,

6   Art. IV, § 8, subd. (c)(2).  On appeal and in these proceedings, he argues that the imposition of

7   this enhancement thus violates the Ex Post Facto Clause of the United States Constitution.

8   Second Supplement to Pet. (Docket No. 1-3) at 33-43.  The Court of Appeal rejected the claim,

9   finding that the amendment was properly adopted as urgency legislation under the California

10  Constitution and case law.  Lodg. Doc. 9 at 24-26.

11          A state court's interpretation of its own law does not raise an issue cognizable on

12  federal habeas unless the state court's interpretation is "clearly untenable and amounts to a

13  subterfuge to avoid federal review of a deprivation by the state of rights guaranteed by the

14  Constitution."  Lopez v. Schriro, 491 F.3d 1029 (9th Cir. 2007) (internal quotation, citation

15  omitted).  An interpretation of state law, even one announced on direct appeal of the challenged

16  conviction, thus usually binds a federal court.  Bradshaw v. Richey, 546 U.S. 74, 76 (2005).

17          Petitioner has presented nothing suggesting that the Court of Appeal's

18  interpretation of the state law relating to urgency legislation is untenable.  This claim too

19  provides no basis for habeas relief.

20          Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a

21  writ of habeas corpus be denied.

22          These findings and recommendations are submitted to the United States District

23  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

24  days after being served with these findings and recommendations, any party may file written

25  objections with the court and serve a copy on all parties.  Such a document should be captioned

26  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

shall be served and filed within ten days after service of the objections.  The parties are advised

that failure to file objections within the specified time may waive the right to appeal the District

Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED:  January 23, 2009.

_____
U.S. MAGISTRATE JUDGE

2/kern0746.157

39